IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | |
|---|---|
| In re Subpoena Issued to Tennessee Department of Correction by Gerald Ross Pizzuto | ) ) ) ) Case No. _____ |

**MEMORANDUM OF LAW IN SUPPORT OF
TENNESSEE DEPARTMENT OF CORRECTION'S
MOTION TO QUASH**

The playbook for stopping executions by lethal injection has become simple: identify the source of the lethal injection chemical(s) (LIC), apply pressure at one or multiple points in the supply chain to prevent sales to the state, and executions are on hold. No one has to convince a court that they would have been "inhuman and barbarous." *In re Kemmler*, 136 U.S. 436, 447 (1890). More than once Tennessee has spent years looking for a new source of LIC. Meanwhile, inmates sentenced to death live into old age while victims' families, law enforcement officers, and communities await execution of a sentence that was imposed by a jury decades ago.

This gambit has played out time and again, most often with barbiturate chemicals like pentobarbital. Pentobarbital is hailed by inmates and experts in states that do not have it as the most humane way to carry out an execution. But once a state *does* finally acquire it, the hunt is on to extinguish the source. It is a dangerous gamble. Once the source of pentobarbital is gone, a state may revert to LIC that inmates' experts deem inferior or to methods inmates "overwhelmingly" rank as inferior to lethal injection. Mary D. Fan, *The Supply-Side Attack on Lethal Injection and the Rise of Execution Secrecy ("Supply-Side Attack")*, 95 B.U. L. Rev. 427, 434 (2015). Still, the payoff for the inmate can be immediate: whatever procedures his future

death will entail, he may enjoy a few more years of life while the state starts over and he litigates a new challenge to whatever alternative the state adopts.

Pizzuto is engaged in his own effort to avoid execution with pentobarbital in Idaho. *Pizzuto v. Tewalt*, No. 1:21-cv-00359, Dkt. 153 (D. Idaho). That suit is an as-applied challenge to Idaho's protocol in which Pizzuto claims "his health conditions and medical history" make pentobarbital uniquely unsuitable for his execution because "one would not expect the average inmate to be at risk of the same pain at another pentobarbital execution." *Id.*, ¶¶ 160-62. Yet he issued a subpoena to the Tennessee Department of Correction seeking "all documents" about the Department's pentobarbital. (Exhibit 1, Pizzuto Subpoena to TDOC,.)

There are four independent reasons the Court should quash his subpoena. First, the Department's sovereign immunity protects it from all coercive processes of judicial tribunals, including compliance with a subpoena. Second, the participant-supplier privilege—recognized historically and in nearly all states with effective execution protocols—protects the requested information from disclosure. Third, the subpoena seeks information entirely irrelevant to Pizzuto's suit in Idaho. Fourth, the subpoena imposes numerous undue burdens on the Department that are disproportionate to the needs of Pizzuto's case. For each of these reasons, the Court "must quash" the subpoena. Fed. R. Civ. P. 45(d)(3)(A).

## BACKGROUND

### I.  TDOC's Lethal Injection Protocol

From the moment that the Tennessee Department of Correction announced its plan to execute inmates with a single fatal dose of pentobarbital, the hunt was on to discover the source. News media immediately requested copies of the protocol. (Collective Exhibit 2, Media TPRA Requests to TDOC.) Within a few weeks, a lawyer who represents some TDOC inmates made a

public records request to the Tennessee Board of Pharmacy seeking, among a litany of other documents:

- a list of every individual, pharmacy, and distributor licensed by the Board in the last decade;

- "[a]ll . . . communications between Board of Pharmacy[] personnel and any employee, agent, contractor, or other representative of any government agency regarding the performance of [executions by] lethal injection;"

- "[a]ll internal . . . communications" regarding the same;

- [a]ll communications with "any private entity or individual regarding" the same; and

- all emails mentioning words like "pentobarbital," "lethal injection," or "execution."

(Exhibit 3, TPRA Request to Tennessee Board of Pharmacy.) That same day, the same attorney made a parallel request to the Tennessee Board of Medical Examiners. (Exhibit 4, TPRA Request to Tennessee Board of Medical Examiners.) And a few days later, she made an even more exhaustive request to TDOC itself, similarly seeking to uncover information about the source of TDOC's LIC. (Exhibit 5, FPD TPRA Request to TDOC.) A week later, Pizzuto issued his subpoena to TDOC seeking a host of information about its source of pentobarbital. (Ex. 1.)

Even with the best-intentioned counsel and carefully-written protective orders, the disclosure of information like this has repeatedly leaked and interrupted executions. It is "humanly impossible to control [the] inadvertent disclosure" of such "extremely potent" information. *Va. Dept. of Corr. v. Jordan*, 921 F.3d 180, 193 (4th Cir. 2019). Anti-death-penalty activists across the country long ago learned that shutting down sources of LIC was a "dramatically successful" way to stop executions—certainly better than testing their theories in court. *Supply-Side Attack*, 95 B.U. L. Rev. at 429. This process began with a "global campaign" against the sole manufacturer of the barbiturate sodium thiopental. *Id*. at 439. Activists chased the manufacturer all the way to

3

Italy, where it was threatened with sanctions if it did not halt production. *Id*. When that source shut down, many States turned to European manufacturers. *Id*. But British activists "partnered with U.S. anti-death penalty lawyers to ferret out new sources of lethal injection drugs and shut them down" through shaming campaigns and doxing. *Id*. When States turned to pentobarbital from Europe, activists targeted a major manufacturer, causing a stock selloff, before the European Union banned the drug's sale for use in lethal injections. *Id*. at 440. Some States even explored purchasing LIC from India, but activists intervened, and, after Indian authorities seized a wholesaler's records, the wholesaler cut off sales to state prisons. *Id*. at 440. When States considered using propofol, another anesthetic, the European Union threatened to cut off exports of the drug for all purposes, jeopardizing its availability for hospitals and clinics. *Anesthesiologists Ask State Not to Use Drug in Executions*, Columbia Daily Tribune (Oct. 1, 2013), available at https://perma.cc/962X-7XJZ. When States tried to obtain LIC from stateside pharmacies, activists chased those down too, leading officials to conclude that revealing a pharmacy's identity "presents a substantial threat of physical harm." Nomaan Merchant, *AG: Texas Can Keep Execution Drug Source Secret*, Dallas News (May 29, 2014), available at https://perma.cc/8CDX-EP7H.

By now, it is a "well-known phenomenon" that "pressure from activists" who discover identifying information shared in litigation leads to suppliers "refus[ing] to supply drugs to state corrections departments." *Jordan*, 921 F.3d at 184. One organization even openly publishes a "risk index" encouraging "[c]ompanies looking to expand . . . to consult the risk profiles . . . before investing." *State-by-State Risk Index*, Lethal Injection Information Center (last accessed February 12, 2025), available at https://perma.cc/X69Z-AHQA. Tennessee, like many other States with the death penalty, coded red for "high risk." *Id*. The message is clear: sell in or to these States, and there is a "high risk" you will suffer blowback. By now, "[o]ver 60 global healthcare companies"

4

restrict States' access to LIC. *Industry Statements*, Lethal Injection Information Center (last accessed February 12, 2025), available at https://perma.cc/2HPD-Q7DH.

Tennessee has suffered the fallout of these pressure campaigns. Before 2013, the Department used three chemicals, including sodium thiopental, to carry out executions. *Workman v. Bredesen*, 486 F.3d 896, 902 (6th Cir. 2007). When sodium thiopental was no longer available, the Department switched to using solely pentobarbital. *West v. Schofield*, 519 S.W.3d 550, 552 (Tenn. 2017). Tennessee was never able to carry out an execution using pentobarbital. And when it lost access to that drug, the Department moved back to three chemicals. *Abdur'Rahman v. Parker*, 558 S.W.3d 606, 611 (Tenn. 2018). Now again able to acquire pentobarbital, the Department has returned to using only pentobarbital.

## II. Pizzuto's Litigation and Subpoena

Pizzuto is a death-row inmate in Idaho who has sued to stop Idaho from executing him with pentobarbital. *Pizzuto v. Tewalt*, No. 1:21-cv-00359, Dkt. 153, ¶¶ 1, 160. An Idaho jury sentenced Pizzuto to death thirty years ago for the 1985 murders of Berta Louise Herndon and Delbert Dean Herndon. *State v. Pizzuto*, 810 P.2d 680, 686 (Idaho 1991). Pizzuto went "hunting" for the Herndons in their cabin in the woods. *Id*. He made Delbert "drop his pants and crawl to the cabin." *Id*. at 687. Then he bound Delbert's wrists with a shoelace and wire before beating his head in with a hammer. *Id*. Pizzuto also tied Berta's wrists and smashed her head with a hammer. *Id*. He buried their bodies in shallow graves near the cabin, which were only discovered after an accomplice who fled to California alerted law enforcement. *Id*.

Pizzuto's complaint alleges a single as-applied claim: "[B]ecause of his health conditions and medical history," Idaho's intended use of pentobarbital creates a unique risk of pain and suffering beyond that of the "average inmate" in "another pentobarbital execution." *Pizzuto v. Tewalt*, No. 1:21-cv-00359, Dkt. 153, ¶¶ 160, 162. Pizzuto alleges that his bladder cancer,

5

Case 3:25-mc-00003  Document 2  Filed 03/19/25  Page 5 of 20 PageID #: 77

coronary artery disease, type 2 diabetes, medication history, and his aged veins present unique risks of suffering. *Id*. ¶¶ 164-66, 222, 253-56.  His complaint does mention Tennessee twice: once in allegations about a purchase of sodium thiopental over a decade ago and once praising Tennessee's Governor for commissioning an independent review of the Department's lethal injection protocol. *Id*. There is no mention of Tennessee's intended use of pentobarbital. Indeed, Pizzuto pleads that "[m]ost" executions with pentobarbital do "not include the kinds of painful reactions" he believes will be caused by his medical conditions. *Id*. ¶¶ 192-93. He has sued Idaho because he believes his conditions "create[] a significant risk of pain greater than that to be otherwise expected." *Id*. ¶ 194.

Purportedly seeking information to support those allegations, Pizzuto issued a subpoena to the Department. (Ex. 1.) In it, he demands "[a]ll documents . . . regarding any pentobarbital that [the Department] obtained for use or potential use in executions." *Id*. His demand includes "testing information[;] . . . purchase receipts; purchase orders; [DEA] forms and other regulatory records; package inserts; chain-of-custody documents; temperature logs; instructions for storage and transportation; communications with the supplier, distributor, and/or manufacturer; *and so forth*." *Id*. (emphasis added). He wants documents from the Department's "attorneys" and all of its 6,000-plus employees. *Id*. (Definition/Instruction 1). He insists on production of "all . . . metadata," though it must be "standardized to Mountain Standard Time." *Id*. (Definition/Instruction 9). And he would like the Department to narrate the disposition of any responsive document it once had but has since destroyed, lost, discarded, or disposed of. *Id*. (Definition/Instruction 10).

### III. Attempts to Resolve Dispute

Pizzuto served his subpoena to the Department on February 13, 2025. On February 24, 2025, after discussion with the undersigned counsel, Pizzuto agreed to give the Department until

6

March 20, 2025 to investigate and respond with objections to the subpoena under Fed. R. Civ. P. 45(d)(2)(B). The Department served written objections on March 12, 2025. (Exhibit 6, TDOC's Objections.) Counsel for Pizzuto and the Department conferred via video-call about those objections on March 19, 2025. Unable to come to an agreement over Pizzuto's requests, the Department now seeks protection from this Court.

## LEGAL STANDARD

Generally, the scope of discovery for a subpoena is the same as that for party discovery. Fed. R. Civ. P. 45, Advisory Commission Notes to 1991 Amendment. Parties have no right to discover privileged or irrelevant information. Fed. R. Civ. P. 26(b)(1). And even the discovery of relevant information "must" be limited if it is overbroad, unduly burdensome, or disproportionate to the needs of the case. Fed. R. Civ. P. 26(b)(2)(C). A party may not "go fishing," and courts have "discretion" to limit discovery. *In re Ohio Execution Protocol Litigation*, 845 F.3d 231, 236 (2016).

But the Rules do afford extra protection to non-parties. A court "must quash" a subpoena that subjects a person to undue burden. Fed. R. Civ. P. 45(d)(3)(A). Courts "balance the need for discovery against the burden imposed on the person ordered to produce documents." *In re: Modern Plastics Corp.*, 890 F.3d 244, 251 (6th Cir. 2018). To do this, a court must consider relevance, the need of the requesting party, the breadth of the request, the time period covered, and the particularity of the request. *Id*. "[T]he status of that person as a non-party is a factor." *Id*.

## ARGUMENT

I.      **The Department Is Immune from Pizzuto's Subpoena.**

States and their agencies enjoy sovereign immunity from suit. *Alden v. Maine*, 527 U.S. 706, 715 (1999). The Department, as an agency of Tennessee, is also immune. *Alabama v. Pugh*, 438 U.S. 781, 782 (1978). Immunity is not just about liability; it protects a State from all the rigors

of judicial proceedings. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Matter of Welfare of J.A.D.*, 13 N.W.3d 423, 436 (Minn. Ct. App. 2024). "The very object [is] to prevent the indignity of subjecting a state to the coercive judicial processes of judicial tribunals at the instance of private parties." *Ex parte Ayers*, 123 U.S. 443, 505 (1887). Sovereign immunity bars any judgment that would "interfere with the public administration" or would effectively "restrain the Government from acting, or compel it to act." *Dugan v. Rank*, 372 U.S. 609, 621 (1963).

That means no discovery from a State, including via subpoena. *Russell v. Jones*, 49 F.4th 507, 515 (5th Cir. 2022); *Bonnet v. Harvest (U.S.) Holdings, Inc.*, 741 F.3d 1155, 1159 (10th Cir. 2014); *Alltel Comms., LLC v. DeJordy*, 675 F.3d 1100, 1105 (8th Cir. 2012); *United States E.P.A. v. Gen. Elec. Co.*, 197 F.3d 592, 597 (2d Cir. 1999); *Boron Oil Co. v. Downie*, 873 F.2d 67, 70-71 (4th Cir. 1989); *Matter of Welfare of J.A.D.*, 13 N.W.3d at 436. Subpoenas "are a coercive judicial process . . . . They issue under the court's authority and are enforced by court order." *Russell*, 49 F.4th at 515. Ignoring States' immunity to subpoenas would subject their "public policy and the administration of their public affairs" to "the mandates of judicial tribunals, without their consent, and in favor of individual interests." *Ayers*, 123 U.S. at 505.

Sovereign immunity is absolute unless the State has waived it, Congress has abrogated it, or some exception applies. *Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999); *Green v. Mansour*, 474 U.S. 64, 68 (1985). None of those have occurred here. Thus, the Department is immune from Pizzuto's subpoena and may not be compelled to answer. Pizzuto's subpoena should be quashed in its entirety.

## II. The Participant-Supplier Privilege Precludes Discovery of Information that Would Unmask the Source of the Department's Lethal Injection Chemicals.

States have long recognized the need to protect the identities of those who participate in delivering ultimate justice. The privilege is justified both to protect individuals from retaliation

8

and to ensure the availability of a supply of LIC and competent professionals to aid the State in its solemn duty. Today, all the States with operative execution protocols extend that same privilege to participants in executions, including LIC suppliers. And both Congress and the President have demonstrated a strong federal interest in supporting the States in the swift administration of the death penalty. This Court should enforce the privilege as a complete barrier to discovery of information that could be used to identify any part of the supply chain of the Department's LIC.

Federal courts are charged to enforce privileges under the common law "in the light of reason and experience." Fed. R. Evid. 501. Congress did not "freeze the law of privilege" in a set list. *Trammel v. United States*, 445 U.S. 40, 47 (1980). Instead, it granted courts "flexibility" to apply privileges as the law developed. *United States v. Gillock*, 445 U.S. 360, 367 (1980). Courts must weigh "the historical and policy considerations underlying" the privilege, along with "the concerns of comity between state and federal sovereignties," against any federal interest in the privileged information. *United States v. Cartledge*, 928 F.2d 93, 96 (4th Cir. 1991); *see Jaffee v. Redmond*, 518 U.S. 1, 10-13 (1996) (applying balancing test).

Applying the balancing test here, the scales tip heavily in favor of the participant-supplier privilege.

<u>*Tradition and Rationale of the Privilege.*</u> "[T]here has . . . been a longstanding tradition of concealing the identities of those who carry out . . . executions." *Owens v. Hill*, 758 S.E.2d 794, 805 (Ga. 2014). "Historically, the executioner was cloaked in anonymity to protect against retaliation by supporters of the condemned and to help communities find people to do the tough job." *Supply-Side Attack*, 95 B.U. L. Rev. at 428. And there is certainly "no longstanding custom or entitlement to know the maker of the rope and scaffold used to hang, or the scaffold and gun used to execute someone by firing squad." *Id*. at 451-52.

The reasons for this policy are just as, if not more, salient today. Recent experience proves that revealing information about States' LIC suppliers leads quickly to retaliation and elimination of sources. Activists have chased potential sources of humane LIC around the world. *Supply-Side Attack*, 95 B.U. L. Rev. at 439-40. And evidence from many jurisdictions proves that the threats suppliers face if identified will cause them to immediately cut off States from their LIC. (Exhibit 7, Ohio Statement (pharmacy demanding return of LIC after unmasking resulted in "firestorm"); Exhibit 8, Texas Declaration (pharmacy insisting it will cut off LIC if unmasked); Exhibit 9, Nebraska Declaration (pharmacy describing fear of retaliation); Exhibit 10, Nevada Declaration (recounting withdrawal of team candidates based on risk of unmasking); Exhibit 11, Alabama Declaration (recounting history of threats to execution team members).) The Department itself will lose access to its source if any information that could identify it is revealed in this litigation. (Exhibit 12, Tennessee Declaration.)

That is why all but two of the States with operative execution protocols have explicitly enshrined a participant-supplier privilege into law. Ariz. Rev. Stat. § 13-757(C); Ark. Code Ann. § 5-4-617(i); Fla. Stat. Ann. § 945.10; Ga. Code Ann. § 42-5-36(d)(2); Id. Admin. Code § 06.01.01.135; Ind. Code. § 35-38-6-1(f); Ky. Rev. Stat. § 45A.720; La. Rev. Stat. § 15:570(G); Miss. Code. Ann. § 99-19-51(3)(c); Mo. Rev. Stat. § 546.720(3); Mont. Code Ann. § 46-19-103(5); Neb. Rev. Stat. § 83-967(2); N.C. Gen. Stat. Ann. § 132-1.2(7); Ohio Rev. Code § 2949.221; 22 Okl. Stat. Ann. § 1015(B); Or. Admin. Rule 291-024-0016(3); Pa. Stat. Ann. § 4305(c); S.C. Code § 24-3-580; S.D. Codified Law § 23A-27A-31.2; Tenn. Code Ann. § 10-7-504(h)(1); Tex. Crim. Proc. Code. Art. 43.14(b); Utah Code Ann. § 64-13-27(3); Wyo. Stat. Ann. § 7-13-916; *see also* Kan. Stat. Ann. § 22-4001(b). And the two outliers still contend that identifying information is protected, even though that privilege is not explicit by statute. *See Floyd v. Daniels*, No. 3:21-cv-

00176, Dkt. 235, 301 (D. Nev.); *Miller v. Hamm*, No. 2:24-cv-00197, Dkt. 102 (M.D. Ala.). That unanimity "among the States indicates that 'reason and experience' support recognition of the privilege." *Jaffee*, 518 U.S. at 13; *see West v. Schofield*, 460 S.W.3d 113, 125 (Tenn. 2015) (finding no barrier to adoption of the privilege).

<u>Comity Between Sovereigns</u>. Comity also favors enforcement of the participant-supplier privilege. "[M]eting out a sentence of death in a timely fashion" is a fundamental exercise of Tennessee's sovereignty. *Cooey v. Strickland*, 604 F.3d 939, 946 (6th Cir. 2010). "Unsettling" the State's ability to carry out its criminal law "inflict[s] a profound injury to the powerful and legitimate interest in punishing the guilty." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998).

Congress recognizes the States' unique prerogative over executions. Marshals implement federal executions "in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596(a). And, in furtherance of "comity, finality, and federalism," *Williams v. Taylor*, 529 U.S. 420, 436 (2000), Congress has specifically legislated in favor of an "effective death penalty," Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132 (1996). Thus, federal courts are "careful to limit the scope of federal intrusion" into this traditional domain of the States. *Williams*, 529 U.S. at 436. And the President recently reiterated the "policy of the United States to ensure that the laws that authorize capital punishment are respected and faithfully implemented." Executive Order, *Restoring the Death Penalty and Protecting Public Safety* (Jan. 20, 2025), available at https://perma.cc/8L24-2QM2.

Moreover, in the face of the unanimous judgment of the States, "[d]enial of the federal privilege . . . would frustrate the purposes of the state legislation." *Jaffee*, 518 U.S. at 13. It would incentivize litigants to exploit federal litigation to uncover sensitive information, thereby erasing the protections States have explicitly enshrined. In the delicate federalist balance, the States have

a unique prerogative over the administration of executions, including the privilege to protect the participants in executions.

*Federal Interest*. The longstanding and widespread protection of those involved in executions and the express statements of two of the federal branches of government supporting the States' interests in carrying out executions greatly outweigh any federal interest in unmasking the source of lethal injection chemicals. Indeed, as discussed in Part II below, courts across the country have consistently held that evidence identifying participants in an execution, including suppliers of lethal injection chemicals, is either irrelevant to protocol challenges or of such minimal value as to be overshadowed by the burdens threatened by disclosure.

Pizzuto's subpoena targets entirely privileged material. He demands documents that would immediately reveal the Department's source of LIC: purchase receipts, regulatory records, chain-of-custody documents, and communications with the source. (Ex. 1.) Even if some documents he requested do not explicitly identify the source, they will likely contain information that will quickly lead to identification. Because that information is privileged, Plaintiff has no right to discover it. Fed. R. Civ. P. 26(b)(1), 45(d)(3)(A)(iii). That is another reason to quash the subpoena in its entirety.

### III. The Requested Discovery Is Irrelevant to Pizzuto's Case.

Information about pentobarbital the Department will use to execute Tennessee inmates is entirely irrelevant to Pizzuto's as-applied challenge to Idaho's lethal injection protocol. Pizzuto's own allegations make the point. He alleges "his health conditions and medical history" create a unique risk of pain and suffering beyond that of the "average inmate" in "another pentobarbital execution." *Pizzuto v. Tewalt*, No. 1:21-cv-00359, Dkt. 153, ¶¶ 160, 162. He admits that "[m]ost" executions with pentobarbital do "not include the kinds of painful reactions" he believes will be caused by his medical conditions. *Id*. ¶¶ 192-93. He has sued Idaho because he believes his

conditions "create[] a significant risk of pain greater than that to be otherwise expected." *Id*. ¶ 194. Regardless of what LIC the Department plans to use in "another execution" of an "average inmate," that has no bearing on Pizzuto's as-applied challenge.

In fact, the source of a State's LIC is irrelevant even to inmates bringing facial challenges to lethal injection protocols. The identity of an out-of-state LIC supplier simply "has no relevance." *In re Mo. Dep't of Corr.*, 839 F.3d 732, 736 (8th Cir. 2016); *In re Lombardi*, 741 F.3d 888, 889-90 (8th Cir. 2014); *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1267 (11th Cir. 2014); *West*, 460 S.W.3d at 126. That is especially true when, as here, "it is quite predictable that the supplier will stop providing the drug . . . once its identity is disclosed." *Jordan v. Comm'r, Mississippi Dep't of Corr.*, 947 F.3d 1322, 1328-30 (11th Cir. 2020); (Ex. 12). That is yet another reason to quash Pizzuto's subpoena.

## IV. The Subpoena's Burdens Are Disproportionate to the Needs of Pizzuto's Case.

This Court can also quash the subpoena because it unduly burdens the Department. Binding precedent and the collective reason of appellate courts across the country support that approach.

The bounds of discovery are plain and dictated by reason. A party is only entitled to discover information that is "nonprivileged," "relevant" to a claim or defense, *and* "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Proportionality goes a step beyond relevance, requiring the Court to consider "the importance of the discovery in resolving the issues" and "whether the burden . . . outweighs its likely benefit." *Id*. And even when a party demonstrates threshold relevance and proportionality, "good cause" justifies "forbidding" that discovery "to protect a party or person from . . . undue burden." Fed. R. Civ. P. 26(c)(1).

The scales tip even farther against a party that seeks discovery via subpoena from a non-party. The issuing party is required to "take reasonable steps to avoid imposing undue burden or

expense" on a non-party." Fed. R. Civ. P. 45(d)(1). And a court "must quash or modify a subpoena" that unduly burdens a non-party. Fed. R. Civ. P. 45(d)(3)(A)(iv). To assess undue burden, courts consider "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *In re: Modern Plastics Corporation*, 890 F.3d at 251. Here, the burdens far outweigh any benefit to Pizzuto.

### A. Any disclosure of the requested information is unduly burdensome.

Applying these principles, appellate courts across the country have reached the same conclusion: an inmate is not entitled to discover information that could identify the source of LIC that will be used to execute him, much less inmates in another state. It is enough alone that the Sixth Circuit has held that disclosing any information "that identifies or reasonably would lead to the identification of any person or entity who participates in the acquisition or use of the specific chemicals, compounded or not," used in executions, is unduly burdensome even when requested in party discovery. 845 F.3d at 234; *see In re Ohio Execution Protocol Litigation*, No. 2:11-cv-1016, 2015 WL 6446093, at *9 (S.D. Ohio Oct. 26, 2015) (containing full text of protective order). As here, because the "logical consequence" of permitting discovery is an end to the supply of LIC, the Department "will suffer an undue burden and prejudice in effectuating" executions. 845 F.3d at 238-39. Pizzuto's request for documents unrelated to his claims from a State that is not going to execute him is disproportionate to the needs of his case under that binding precedent.

Other decisions confirm this. *See, e.g., Sepulvado v. Jindal*, 729 F.3d 413, 420 (5th Cir. 2013) (holding no due process right to know details of an execution protocol); *Owens*, 758 S.E.2d at 805 ("[T]here has . . . been a longstanding tradition of concealing the identities of those who carry out . . . executions."); *Bryan v. State*, 753 So.2d 1244, 1251 (Fla. 2000); *McGehee v. Texas Dep't of Criminal Justice*, No. MCH-18-1546, 2018 WL 3996956, at *8 (S.D. Tex. Aug. 21, 2018)

("Courts in the Fifth Circuit have consistently denied requests for disclosure of information about the compounding pharmacy providing the pentobarbital.") (collecting cases); *id.* at *10-11 (finding disclosure would create undue burden and that information was irrelevant). Disclosure of the identity of a State's LIC supplier "has no relevance" to an inmate of another State and "will result in an undue burden." *In re Mo. Dep't of Corr.*, 839 F.3d at 736. "[D]isclosing [an LIC] source's identity would create a substantial threat of physical harm to the source's employees and others." *Tex. Dep't of Crim. Just. v. Levin*, 572 S.W.3d 671, 673 (Tex. 2019). Balanced against the irrelevance of the information to Pizzuto's case, the heavy burden of disclosure on the Department is disproportionate.

Nor would it be appropriate to order disclosure under a protective order. Not only is Pizzuto not entitled to the information in the first place, but for "extremely potent confidential information" like the identity of LIC suppliers, "it would be humanly impossible to control its inadvertent disclosure." *Va. Dep't of Corr.*, 921 F.3d at 193. "[A] drug supplier would probably take little comfort in knowing that disclosure was limited to death-row inmates and their lawyers." *Id*. "[I]t is likely that active investigation" of the Department's source "will lead to further disclosure of [its] identit[y]." *In re Lombardi*, 741 F.3d at 894. Once disclosed, the Department's access to pentobarbital will be cut off. (Ex. 12; *In re Ohio Execution Protocol Litigation*, 845 F.3d at 238 (finding cessation of executions was "logical consequence" of disclosure).

Even the Supreme Court has weighed in favoring the Department. When the Ninth Circuit bucked the consensus of other courts and stayed an execution until Arizona provided an inmate with "(a) the name and provenance of the drugs to be used in the execution and (b) the qualifications of the medical personnel," the Supreme Court summarily vacated the injunction. *Ryan v. Wood*, 573 U.S. 976 (Mem.) (2014).

This Court must follow the Sixth Circuit's decision in *In re Ohio Execution Protocol Litigation* and the Supreme Court's summary decision in *Ryan*. Doing so also follows the national consensus of courts presented with similar questions. Applying those decisions to this case, the Court must quash Pizzuto's subpoena. Fed. R. Civ. P. 26(b)(1), 26(c)(1).

### B. Pizzuto's definitions, instructions, and terms amplify the burden.

On top of the burden of disclosure, Pizzuto's definitions, instructions, and terms heap additional unnecessary burdens. If the Court did not already have multiple reasons to quash the subpoena outright, it would also have good cause to modify the subpoena to protect the Department from these burdens.

First, the subpoena appears to target information that falls squarely within the attorney-client privilege and the work-product doctrine. Those doctrines protect confidential communications relating to legal advice from an attorney, *Reed v. Baxter*, 134 F.3d 351, 355 (6th Cir. 1998), and documents prepared by or for an attorney in anticipation of litigation, *Regional Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 713 (6th Cir. 2006). Pizzuto's Definition 1 specifically seeks documents from the Department's "attorneys." Given that the Department has been and will remain in active litigation over its protocol, such a request plainly targets information that is privileged or protected. Even searching for—let alone logging—information that is plainly privileged or protected unduly burdens the Department when that information has no relevance to Pizzuto's litigation.

Second, the terms of the request itself make it impossible for the Department to determine the full reach of the request. It seeks "all documents . . . regarding any pentobarbital . . . including" a lengthy list of different types of documents "and so forth." (Ex. 1.) The Department cannot know what information is responsive to the request for "and so forth" documents. *Vontz v. Malone*,

16

Case 3:25-mc-00003    Document 2    Filed 03/19/25    Page 16 of 20 PageID #: 88

No. 2:19-cv-12735, 2022 WL 1037100, at *2 (E.D. Mich. Apr. 6, 2022) ("Nor does the inclusion of the general term 'etc.' in the request satisfy the particularity requirement.").

Third, such an overbroad and vague request would be time-consuming and expensive to fulfill when coupled with Definition 1's instruction to search all "officers, agents or agencies, representatives, attorneys and/or any person or entity acting on [the Department's] behalf." (Ex. 1.) Searching for "and so forth" documents from all of the Department's 6,000 employees will consume immense resources. Again, that burden substantially outweighs the benefit to Pizzuto of receiving irrelevant information.

Fourth, the instructions for production multiply this expense. Pizzuto insists that the Department produce "metadata" and "native files," "standardized to Mountain Standard Time." These instructions only increase the burden of document collection and processing. But Pizzuto cannot demonstrate how such metadata is in any way relevant to his case, nor why he should not bear the cost of "standardiz[ing]" such metadata to his own time zone. "In most cases and for most documents, metadata does not provide relevant information." *Kentucky Speedway, LLC v. NASCAR, Inc.*, No. 05-138-WOB, 2006 WL 5079480 (E.D. Ky. Dec. 18, 2006). Without Pizzuto demonstrating any particular need for metadata, the presumption is that the Department does not have to produce it. *Williams v. Sprint/United Mgmt. Co.*, 230 F.R.D. 640, 651 (D. Kan. 2005) (reviewing Sedona Principles for Electronic Document Production regarding metadata).

Fifth, the subpoena purports to require the Department to respond with a narrative identifying documents it may have once had but has since destroyed, lost, discarded, or otherwise disposed of. Such an instruction would require even more resources to be spent searching for documents that do not exist. Plus, it improperly seeks an interrogatory-style response from a non-

party. *United States v. One Parcel of Real Prop. Described as Lot 41, Berryhill Farm Estates*, 128 F.3d 1386, 1397 (10th Cir. 1997).

The breadth and burden of Pizzuto's subpoena are unjustified by any need of Pizzuto's case.

## CONCLUSION

Pizzuto's subpoena is barred by sovereign immunity, seeks only information that is privileged and irrelevant to his as-applied Idaho suit, and burdens the Department in a manner greatly disproportionate to the needs of his case. Those are four independent reasons to quash the subpoena.

This is no mere academic exercise in discovery rules. Information about LIC sources, once disclosed to lawyers litigating challenges to execution procedures, has undeniably led to the unmasking of those sources, harassment and threats, and ultimately the denial to States of access to humane LIC and competent professionals. Tennessee has more than once suffered the fallout of activist campaigns that cut off its access to humane LIC, forcing delays of executions while it prepared new protocols. Now that it has acquired pentobarbital—often touted by inmates as an effective and painless method of inducing death—the Department has good cause to believe that discovery of information about its source will cause that source to disappear. The Court should prevent that significant harm, and yet another delay of justice, by quashing Pizzuto's subpoena.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

/s/ *Cody N. Brandon*
CODY N. BRANDON (BPR# 037504)
Managing Attorney
Senior Assistant Attorney General

18

MARY MCCULLOHS (BPR# 026467)
Senior Assistant Attorney General

DAVID WICKENHEISER (BPR# 040427)
Assistant Attorney General

MATTHEW W. KUBICEK (BPR# 040774)
Assistant Attorney General

Law Enforcement and
Special Prosecutions Division
Office of the Tennessee
Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
Off. (615) 532-7400
Fax (615) 532-4892
Cody.Brandon@ag.tn.gov
Mary.McCullohs@ag.tn.gov
David.Wickenheiser@ag.tn.gov
Matthew.Kubicek@ag.tn.gov
*Counsel for the Department*

**CERTIFICATE OF SERVICE**

   I certify that on the 19th day of March, 2025, a copy of the foregoing was filed and served via mail, with a courtesy copy by email, on the following:

Jonah J. Horwitz
Federal Defender Services of Idaho
Capital Habeas Unit
702 W. Idaho, Suite 900
Boise, Idaho 83702
208-331-5530
Jonah_horwitz@fd.org

               /s/ *Cody N. Brandon*
               CODY N. BRANDON
               Managing Attorney