**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | **Civil No. 3:25-mc-00003** |
| | ) | |
| **SUBPOENA ISSUED TO TENNESSEE** | ) | |
| **DEPARTMENT OF CORRECTION BY** | ) | |
| **GERALD ROSS PIZZUTO, JR.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| | ) | **Magistrate Judge Chip Frensley** |
| **GERALD ROSS PIZZUTO, JR.,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **JOSH TEWALT, et al.,** | ) | |
| Defendants. | ) | |

**RESPONSE TO MOTION TO QUASH [Dkt. 1]**

The Tennessee Department of Correction (TDOC or the Department) takes the extraordinary position that it is unable to reveal a *single word* in response to a lawful subpoena about the most awesome power it exercises: taking human life. *See* Dkt. 2; Ex. 1. Its central justification for that blanket obstructionism is that it fears the unmasking of its execution-drug supplier. But that is a concern that has been accommodated in countless cases around the country by targeted redactions and withholdings—not stonewalling. TDOC has no authority from any court anywhere in the United States for the extreme proposition that a correctional department is entitled to withhold every single character on every single piece of paper that concerns execution drugs. This Court should not be the first. For those reasons, and the others set forth below,

Plaintiff Gerald Ross Pizzuto, Jr. respectfully asks the Court to deny the motion to quash, Dkt. 1, or at least order TDOC to provide a privilege log.[1]

## I.   TDOC does not enjoy sovereign immunity.

Attempting to evade any responsibility to engage with the subpoena, TDOC begins with a tenuous appeal to sovereign immunity. *See* Dkt. 2 at 7–8. Apart from some general caselaw about immunity, TDOC offers only one outlier authority that is truly on point and which favors its stance: *Russell v. Jones*, 49 F.4th 507 (5th Cir. 2022). Mr. Pizzuto acknowledges that *Russell* answers the question presented in TDOC's favor, i.e., whether sovereign immunity protects a state agency from a non-party subpoena. *See id.* at 515. Notably, however, *Russell* is the *only* case that has provided that answer. By contrast, three federal courts of appeal have held that a non-party subpoena does *not* trigger state sovereign immunity. *See Ott v. City of Milwaukee*, 682 F.3d 552, 556 (7th Cir. 2012); *In re Mo. Dep't of Nat. Res.*, 105 F.3d 434, 436 (8th Cir. 1997); *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 778 (9th Cir. 1994).

This majority rule is far sounder than the poorly supported one proposed by TDOC. Under the plain language of the Eleventh Amendment, states are insulated by sovereign immunity only from "any *suit* in law or equity." U.S. Const., Am. XI.[2] Recognizing the straightforward significance of these words, the U.S. Supreme Court has interpreted the Eleventh Amendment as "confer[ring] an immunity *from suit*." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993); *accord Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974) (describing the Eleventh Amendment as safeguarding states "from *suits* brought in federal

---

[1] Given the overlap between the different sections, every part of this response is incorporated into every other part.

[2] Unless otherwise noted, all internal quotation marks are omitted, all emphasis is added, and all citations are cleaned up.

courts"). The word "suit," in the Eleventh Amendment, has the same meaning it would anywhere else: a cause of action seeking relief against a defendant. *See Cohens v. Virginia*, 19 U.S. 264, 408 (1821) (characterizing a "suit" with reference to a form proceeding "against the State, for the purpose of establishing some claim against it by" a "judgment"); *see also Dugan v. Rank*, 372 U.S. 609, 620 (1963) (similar). Following this approach, the Supreme Court has found state sovereign immunity where an action "walks, talks, and squawks very much like a lawsuit." *Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 751 (2002).

A non-party subpoena does none of those things. Such a subpoena merely requests documents—it does not make out a claim against a state or seek any judicial relief based on a purported violation committed by it. The "production of . . . documents" hardly "infringes" on a state's "autonomy or threaten[] its treasury." *In re Mo. Dep't of Nat. Res.*, 105 F.3d at 436. Instead, "[g]overnmental units are subject to the same discovery rules as other persons and entities having contact with the federal courts." *Id.*; *see Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 398 n.2 (D.C. Cir. 1984) (declining "to upset a steady course of precedent by attempting to graft onto discovery law a broad doctrine of sovereign immunity"). To Mr. Pizzuto's knowledge, *Russell* is the only circuit opinion in American history to ignore the usual meaning of the word "suit" and afford a state sovereign immunity to a non-party subpoena. There is no need for this Court to make the same mistake.

Tellingly, in none of the non-party subpoena cases involving similar subject-matter to the present case—execution information—did courts extend sovereign immunity, even though the matter was raised repeatedly. *See generally Jordan v. Comm'r, Miss. Dept. of Corrs.*, 947 F.3d 1322 (11th Cir. 2020) (not mentioning sovereign immunity); *see also Va. Dept. of Corrs. v. Jordan*, 921 F.3d 180, 188 (4th Cir. 2019) (declining to address sovereign immunity and

resolving the appeal on other grounds); *In re Mo. Dept. of Corrs.*, 839 F.3d 732, 737 (8th Cir. 2016) (per curiam) (same). Whenever sovereign immunity has been squarely considered in the present context, the defense has been rejected. *See McGehee v. Neb. Dep't of Corr. Servs.*, No. 4:18-cv-3092, 2019 WL 1227928, at *4 (D. Neb. Mar. 15, 2019) (concluding that sovereign immunity did not preclude the subpoena and citing other district courts), *vacated on unrelated grounds by* 987 F.3d 785 (8th Cir. 2021). The same course of action is appropriate here.

Nor do TDOC's other citations compel a different result. Aside from *Russell*, TDOC has nothing on-point. Three of its cases deal with *tribal* sovereign immunity, which is not at issue here. *See Bonnet v. Harvest (U.S.) Holdings, Inc.*, 741 F.3d 1155 (10th Cir. 2014); *Alltel Commc'ns, LLC v. DeJordy*, 675 F.3d 1100 (8th Cir. 2012); *Matter of Welfare of J.A.D.*, 13 N.W.3d 423 (Minn. Ct. App. 2024). And another two implicate *federal* sovereign immunity, a different species than the one in play here. *See U.S. EPA v. GE Co.*, 197 F.3d 592 (2d Cir. 1999); *Boron Oil Co. v. Downie*, 873 F.2d 67 (4th Cir. 1989). *Russell* is TDOC's single weak reed.

There is every reason to suppose the Sixth Circuit would join the mainstream. In the Sixth Circuit, as everywhere else, sovereign immunity "protects states . . . from *suit* in federal court." *Boler v. Earley*, 865 F.3d 391, 409–10 (6th Cir. 2017). There is no basis to imagine that the Sixth Circuit would embrace *Russell*'s counterintuitive and unique view that a subpoena for documents somehow constitutes a "suit" within the meaning of the Eleventh Amendment. This Court should not follow the Fifth Circuit's unusual path and should not extend sovereign immunity to TDOC.

## II.     No privilege bars the subpoena.

Breaking from the norm again, TDOC asks this Court to become the only one in the country to recognize a new federal privilege based on execution secrecy. *See* Dkt. 2 at 8–12. There is no occasion for it to do so.

New privileges "are not lightly created nor expansively construed." *United States v. Nixon*, 418 U.S. 683, 710 (1974), *superseded by statute on other grounds as recognized by Bourjaily v. United States*, 483 U.S. 171, 177–79 (1987). Although the creation of a privilege under state law might sometimes counsel in favor of recognizing the privilege in federal court, "[t]he appropriateness of deference to a state's law of privilege is diminished" where, as here, "a defendant state actor [is] alleged to have violated citizens' federal rights." *Pearson v. Miller*, 211 F.3d 57, 68 (3d Cir. 2000). Applying these principles, the courts have uniformly agreed that execution secrecy statutes should not be imported into federal discovery law as new privileges.

The most important court to so agree is, for present purposes, the Sixth Circuit. In 2016, the Sixth Circuit went out of its way to announce that it was electing not to "federalize the Ohio secrecy law as a common-law privilege for immunity." *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 239 (6th Cir. 2016). There is no meaningful difference between the language of the Ohio statute at issue there, and the Tennessee law relied upon by TDOC. *Compare id.* at 233–34 (quoting language from the Ohio provision that "precludes, among other things, the release of information that would identify the manufacturer or supplier of drugs for use in Ohio's lethal-injection protocol"), *with* Tenn. Code Ann. § 10-7-504(h)(1) (doing the same in Tennessee). TDOC itself includes the Ohio statute in its list of relevant execution-secrecy statutes. *See* Dkt. 2 at 10. The Sixth Circuit has already declined to go down the path TDOC now recommends.

What is more, the Sixth Circuit's decision to reject a new execution-secrecy privilege is consistent with the approach taken by every other federal court to consider the matter. *See*

*Pizzuto v. Tewalt*, --- F.4th ----, 2025 WL 877591, at *10 (9th Cir. 2025) ("Idaho's secrecy statute does not create an evidentiary privilege that binds federal courts"); *accord Jordan*, 947 F.3d at 1340; *Martin v. Ward*, No. 1:18-cv-4617, 2021 WL 1186749, at *10 (N.D. Ga. Mar. 30, 2021); *Hoffman v. Cain*, No. 12-796, 2014 WL 12662276, at *2 (M.D. La. Jan. 13, 2014).

TDOC does not even acknowledge, let alone grapple with, this wall of adverse precedent. Rather, it focuses on proving a point that is undisputed, and that has no bearing on the resolution of the issue: states have an interest in "concealing the identities of those who carry out executions." Dkt. 2 at 9. There is no doubt such an interest exists. But the question is how to protect it: through a new privilege, or through the traditional undue-burden analysis in Federal Rules of Civil Procedure 26(c) and 45(d). Every single one of the cases arrayed above chose the latter. *See, e.g.*, *Pizzuto*, 2025 WL 877591, at *9–14; *Jordan*, 947 F.3d at 1340–42; *In re Ohio Execution Protocol Litig.*, 845 F.3d at 235–40. Because the Federal Rules of Civil Procedure are more than up to the task of safeguarding TDOC's asserted interest, the Court should follow the lead set by these many other decisions and err on the side of "hesitan[cy]" to adopt a "new federal privilege[] arising from state law." *Jordan*, 947 F.3d at 1336. Although TDOC is not the party Mr. Pizzuto has sued, the Department's interpretation of secrecy statutes would apply equally to discovery requests geared at defendants. As a consequence, the interpretation would undermine the idea that state authorities cannot "define the scope of their own privilege when the misconduct of their agents is alleged." *ACLU of Miss., Inc. v. Finch*, 638 F.2d 1336, 1343–44 (5th Cir. 1981); *accord Kelly v. City of San Jose*, 114 F.R.D. 653, 655–56 (N.D. Cal. 1987) ("If state law controlled, state authorities could effectively insulate themselves from constitutional norms simply by developing privilege doctrines that made it virtually impossible for plaintiffs to develop the kind of information they need to prosecute their federal claims.").

TDOC's ode to comity does not change the outcome. *See* Dkt. 2 at 11–12. While the federal courts have a duty to respect the states' criminal justice systems, they are more than capable of doing so within the confines of the Federal Rules of Civil Procedure, and without the interference of a new privilege. In fact, in several of the cases referenced earlier, federal courts used the undue-burden test in the Federal Rules to reject inmates' discovery requests while explicitly relying, in part, on the states' sovereignty and their need to enforce criminal judgments. *See In re Ohio Execution Protocol Litig.*, 845 F.3d at 238 ("To ignore Defendants' interest in a capability to perform executions is to ignore the elephant in the room."); *see also Jordan*, 947 F.3d at 1340 (commenting that "Georgia obviously has a strong interest in enforcing its criminal laws," that its "interest encompasses the state's ability to implement a lawfully imposed death sentence," and that such an interest played a rule in the application of Rule 45). Federal courts are well-equipped to weigh states' interests in effectuating death sentences without resorting to a new privilege.

Finally, even if a new privilege did exist, it would not authorize TDOC's wholesale defiance of the subpoena. TDOC defines its purported privilege with reference to "evidence identifying participants in an execution," Dkt. 2 at 12, and that is also what is protected by the statutes it gathers, *see id.* at 10. As Mr. Pizzuto outlines in detail below, his subpoena can be responded to without TDOC "identifying" any "participants in an execution," including drug suppliers. *See infra* at Parts IV, V. TDOC is in its section on privilege, as throughout its motion to quash, fighting the wrong battle.

### III.    The subpoena seeks relevant material.

TDOC makes a cursory and ill-informed nod to relevance, *see* Dkt. 2 at 12–13, but the two short paragraphs it produces on the subject fail to justify the Department's non-responsiveness to the subpoena.

To make out its case on relevance, TDOC cherry-picks from Mr. Pizzuto's complaint the allegations he has made in Idaho about his "health conditions and medical history." Dkt. 2 at 12. Where TDOC errs is in not reading anything else in the complaint. In particular, Mr. Pizzuto also highlighted in his complaint the reliability of the chemicals as one of the factors giving rise to an unconstitutional risk of a cruel and unusual execution. *See* Ex. 2 at 6 (referring to "the use of an unreliable drug" as one thing that would "increase the risk of an unconstitutionally painful execution in violation of the Eighth Amendment").[3] That area of concern is not tethered to Mr. Pizzuto's health situation.

Mr. Pizzuto's theory of relevance for the Department's records is based on the likelihood that Tennessee and Idaho have the same source of execution drugs. If they do, and if there are chemical flaws in TDOC's drugs, that obviously increases the chances that there are likewise deficiencies in Idaho's pentobarbital. To undersigned counsel's knowledge, the states germane to Mr. Pizzuto's argument are Idaho, Indiana, Utah, South Carolina, and Tennessee. In the first four states in that list, no one was executed between July 2012 and July 2024. *See* Death Penalty Information Center, Execution Database, https://deathpenaltyinfo.org/database/executions (DPIC Executions).[4] The primary reason for the drought in executions was the inability of these states to

---

[3] Mr. Pizzuto respectfully asks the Court to take judicial notice of any filings from other cases referenced here. *See Elec. Merchant Sys. LLC v. Gaal*, 58 F.4th 877, 883 (6th Cir. 2023); Local Rule 7.01(d)(5).

[4] The source cited above is a "well-respected national database[]." *State v. Bartol*, 368 Or. 598, 608 n.5, 496 P.3d 1013, 1019 n.5 (2021) (en banc).

obtain drugs.[5] Within the space of a single year, the same drug—pentobarbital—materialized in all four states.[6]

The sky-high cost of drug acquisition in these states further links them together. Idaho has spent $200,000 on three batches. *See* Ex. 6. For its part, Utah paid $200,000 in June 2024 to an individual who took the initiative to contact the state and offer it pentobarbital. *See* Ex. 4 at 2. Indiana apparently spent $900,000 on its execution drugs. *See* Ex. 7. And now Tennessee has seemingly invested at least $520,000 in its own. *See* Kelly Puente, *Tennessee has paid $600,000 for lethal injection drugs, but specific details remain secret*, The Tennessean, Mar. 20, 2025, https://www.tennessean.com/story/news/crime/2025/03/20/tennessee-death-row-lethal-injection-pentobarbital/82517783007/.

The execution history is different in Tennessee than in these other jurisdictions. In the last seven years, seven inmates have been put to death in Tennessee. *See* DPIC Executions. Critically, though, none of them were executed with pentobarbital. In fact, as TDOC says in its motion to quash, "Tennessee was never able to carry out an execution using pentobarbital." Dkt.

---

[5] *See Owens v. Stirling*, 443 S.C. 246, 258, 904 S.E.2d 580, 586 (2024) ("Until recently, according to the State's brief, South Carolina had, for almost a decade, been unable to obtain the drugs necessary to carry out an execution by lethal injection."); Isabella Volmert, *Indiana seeks first execution since 2009 after acquiring lethal injection drug, governor says*, AP, June 26, 2024, https://apnews.com/article/indiana-execution-lethal-injection-drugs-94da18464a7bab734275a412ecd9931f ("The yearslong pause has been attributed to the unavailability of lethal injection drugs."); IDOC serves death warrant to Gerald Pizzuto, Feb. 24, 2023, https://www.idoc.idaho.gov/content/news/idoc-serves-death-warrant-gerald-pizzuto-0 (reflecting that Idaho could not carry out a death warrant because it was "not in possession of the chemicals necessary to" do so).

[6] *See* Ex. 3 at 3 (containing Idaho's admission that it "identified a source of execution chemicals," i.e., pentobarbital, "on or about October 12, 2023"); Ex. 4 at 2 (indicating that a drug supplier contacted Utah shortly after a June 10, 2024 hearing to advertise pentobarbital); Ex. 5 at 2 (certifying on August 28, 2024 that South Carolina possessed pentobarbital); Volmert, *supra* (reporting on June 26, 2024 that Indiana acquired pentobarbital).

2 at 5. That was even though TDOC had issued a protocol as early as 2013 for a single-drug pentobarbital cocktail. *See West v. Schofield*, 519 S.W.3d 550, 552 (Tenn. 2017). As a result, Tennessee's most recent lethal-injection executions, in 2018 and 2019, did not include pentobarbital. *See Abdur'Rahman v. Parker*, 558 S.W.3d 606, 611–14 (Tenn. 2018). Then, out of the blue, Tennessee switched back to pentobarbital again in January 2025. *See* Ex. 8 at 13.

To summarize the history above, five states all lacked pentobarbital execution drugs for more than a decade. Then, all five located drugs within the same period of time, with each of the known expenditures being exorbitant. These facts raise the unmistakable probability that all five states are getting their drugs from the same opportunistic source.

With the likelihood of an overlapping source established, the benefit of the information to Mr. Pizzuto becomes undeniable. A federal magistrate judge in the Southern District of Indiana has already ably explained why. *See* Ex. 9. In September 2024, Mr. Pizzuto served on the Indiana Department of Correction (INDOC) a subpoena similar to the one at issue here. *See id.* at 2. INDOC filed a motion to quash, arguing in part that the material was irrelevant "because there is no connection between Idaho's pentobarbital and Indiana or its pentobarbital." *Id.* at 5. The district court disagreed, determining that, "[i]f Indiana and Idaho do in fact have the same supplier, then documents related to the stability of Indiana's pentobarbital" are relevant. *Id.* at 7. "Moreover," the district court continued, Mr. Pizzuto's "inference regarding the shared supplier is not without support" given the history laid out above. *Id.* The district court therefore concluded that Mr. Pizzuto had offered "a reasonable likelihood for his belief," which was all he had to do, since "[r]elevance in discovery is broader than relevance at trial" and, when "relevance is in doubt, courts should err on the side of permissive discovery." *Id.* at 7–8.

TDOC gives this Court no foundation for reaching a different conclusion here. If there is a sufficient connection between Indiana and Idaho, then there is a sufficient connection between Tennessee and Idaho. The same general legal principles govern discovery here as they do in Indiana. *See, e.g.*, *Zientek v. State Farm Fire & Cas. Co.*, No. 1:05-cv-326, 2007 WL 2793361, at *3 (E.D. Tenn. Sept. 26, 2007) (describing material as "of marginal relevance" but resolving to "err on the side of admissibility"). TDOC's relevance attack fares no better in Tennessee.

When courts have rejected relevance theories in similar circumstances, it has been because they were far more attenuated than Mr. Pizzuto's. In the *Jordan* cases, for example, the plaintiffs were challenging protocols in states that did *not* use the single-drug pentobarbital method that Idaho, Indiana, and Tennessee have all now adopted. *See Jordan*, 947 F.3d at 1325; *In re Mo.*, 839 F.3d at 734. Thus, the plaintiffs sought information from other states that did have a one-drug pentobarbital protocol to prove that the drug was available, as part of the showing necessary to satisfy the more-humane-alternative prong of execution challenges. *See Jordan*, 947 F.3d at 1326; *In re Mo.*, 839 F.3d at 736. It was that account that the Sixth and Eighth Circuits found so implausible. *See Jordan*, 947 F.3d at 1342 (discounting as "totally incredible" the argument that "if Plaintiffs could just identify the source of this drug, Plaintiffs could perhaps broker a deal between Mississippi and the now-anonymous Georgia supplier"); *accord In re Mo.*, 839 F.3d at 736. Mr. Pizzuto has a far more logical chain to point to than the inmates in these cases. As set forth above, he is not relying on any tenuous inferences about what drugs might potentially be provided in the future—he is relying on concerns about execution chemicals that have already been made available to both Tennessee and Idaho.

A consideration of the terms of the subpoena tends toward the same outcome. Most directly, the subpoena targets "testing information, such as certificates of analysis." Dkt. 1-1 at

7.[7] That would illuminate in a straightforward fashion whether there are issues with the makeup of TDOC's drugs, which could well be shared with Idaho's. Other elements of the subpoena get to the same destination through a less direct route. "Drug Enforcement Administration forms and other regulatory records," along with "chain-of-custody documents," *id.*, would bear on whether the drugs took an extended journey from the manufacturer to the supplier, which could in turn impact their quality, *see* Ex. 10 at 3. Documents like "temperature logs" and "instructions for storage and transportation" would speak to the ideal conditions for the drugs, Dkt. 1-1 at 7, and if they were kept in less-than-ideal circumstances in Idaho that would bolster Mr. Pizzuto's claim. The regulatory records sought in the subpoena might reveal problems like misbranding, which would also go to reliability concerns. *See Cook v. FDA*, 733 F.3d 1, 10–12 (D.C. Cir. 2013) (finding that states had unlawfully imported misbranded drugs for executions into the country).

As for communications with suppliers, it is easy to imagine ways in which they could bear on the reliability of the drugs. For example, when Idaho was preparing to carry out its most recent successful execution, in 2011 and 2012, it contacted a man named Chris Harris to inquire about the possibility of purchasing drugs from him. *See* Ex. 11 at 8. With all identifying information about Mr. Harris redacted, the emails would still indicate that he was based in India, *see id.* at 7, a place where quality control for drugs is reduced as compared to other parts of the world, *see* Ex. 10 at 3. These are just some of the myriad ways in which the information sought is likely to open a window into the reliability of the drugs in Idaho's possession. Because reliability is at the heart of Mr. Pizzuto's Idaho lawsuit, responsive materials are plainly relevant.

## IV.     The subpoena imposes no undue burden on TDOC.

---

[7] Because the subpoena is not consecutively paginated, citations are to the ECF page numbers.

On the question of undue burden, TDOC strings together a series of cites for the irrelevant proposition that an inmate is not entitled to discover the identity of an execution-drug supplier—something, to repeat, Mr. Pizzuto is not asking for. *See* Dkt. 2 at 14–16. In so doing, TDOC overlooks the actual issue presented here: does the Department's interest in the anonymity of its supplier permit it to refuse to disclose a single word on a single piece of paper, and even to describe what documents are in its possession? Ironically, to the extent they have anything to do with the subject-matter at bar here, TDOC's citations demonstrate that the Department's across-the-board silence in the face of a valid subpoena is inappropriate.

At the outset, several of TDOC's cases can be categorically dismissed from the conversation. For several of them have to do with whether individuals enjoy a *constitutional* right to access execution-related information or whether they have a right based in a *public record statute*. *See, e.g.*, *Ryan v. Wood*, 573 U.S. 976 (2014) (per curiam); *Sepulvado v. Jindal*, 729 F.3d 413 (5th Cir. 2013); *Bryan v. State*, 753 So. 2d 1244 (Fla. 2000); *Tex. Dep't of Criminal Justice. v. Levin*, 572 S.W.3d 671 (Tex. 2019). Mr. Pizzuto comes to this Court on a very different footing from such litigants. He is prosecuting a civil case in which he is entitled, under the federal rules, to seek discovery. *See* Ex. 12; Ex. 13 at 11; *Pizzuto*, 2025 WL 877591.

When it comes to the cases that are on-point, Mr. Pizzuto agrees with TDOC that the most significant of them is *In re Ohio Execution Protocol Litigation*, since it was issued by the Sixth Circuit. *See* Dkt. 2 at 14. However, that opinion has the exact opposite meaning from the one TDOC ascribes to it, as it expressly *authorized* precisely the kind discovery that Mr. Pizzuto is seeking. The Sixth Circuit was contending there with the plaintiffs' appeal from the entry by the district court of a protective order. *See In re Ohio Execution Protocol Litig.*, 845 F.3d at 233. As the Sixth Circuit framed the issue on appeal, it was whether the district court abused its

discretion by issuing "a protective order precluding the disclosure of any information that could reveal the identity of suppliers or manufacturers of Ohio's lethal-injection drugs." *Id.* In the Sixth Circuit's view, the answer was no. *See id.* at 235–40.

It is simply not true, as TDOC would have it, that *In re Ohio Execution Protocol Litigation* is "enough alone" to settle the instant case. Dkt. 2 at 14. Mr. Pizzuto reiterates that he is *not* seeking the identity of Tennessee's suppliers. What TDOC needs from *In re Ohio Execution Protocol Litigation* is an opinion shutting down any discovery surrounding execution drugs. It did nothing of the sort. *In re Ohio Execution Protocol Litigation* represents probably the most extended discovery into execution-related subjects in the country. The district court docket in the case is more than 3,940 entries long and contains thirteen-years' worth of discovery litigation, extending all the way up until today—six years after the Sixth Circuit ruled. *See In re: Ohio Execution Protocol Litig.*, No. 2:11-cv-1016, Dkts. 55, 3,944. That discovery has included investigation into information that would be completely prohibited under TDOC's extreme view of secrecy. In 2019, for example, the plaintiffs deposed an anonymous member of Ohio's execution team—something that would, under TDOC's secrecy theory, be far outside the pale. *See id.*, Dkt. 2461-39. TDOC's belief that every single word about its drugs automatically qualifies as "information that could be used to identify" the source, Dkt. 1-12 at 2, is clearly not how execution litigation works in the Sixth Circuit.

Nor is it how execution litigation works anywhere else. In the Eleventh Circuit, the identity of execution suppliers is also protected. *See Jordan*, 947 F.3d at 1328–30. Yet in Georgia, a compounding pharmacist involved in executions was deposed. *See Nance v. Ward*, N.D. Ga., No. 1:20-cv-107, Dkt. 132-28. That deposition took place consistent with the district court's judicious balancing of Georgia's interest in "enforce[ing] its laws" against the "basic

presumption . . . that the public is entitled to every person's evidence." *Martin*, 2021 WL 1186749, at *2, *9. In the same order, the *Martin* court resolved a series of discovery disputes, ordering the correctional department to disclose information about how chemicals were "created, stored, and transported" because the prisoner was "attacking the potency of Georgia's compounded pentobarbital." *Id.* at *5. All of that information is responsive to Mr. Pizzuto's subpoena, and all of it is off-limits according to TDOC. The same reality obtains in Florida. *See Brant v. Allen*, No. 3:13-cv-412, 2024 WL 21970, at *5 (M.D. Fla. Jan. 2, 2024) (granting in part plaintiffs' motions to compel in a similar case and ordering the production of various execution-related information, including material "about [the] purity and efficacy" of the drugs). Even in Virginia, where the department of corrections also moved to quash a non-party subpoena, the agency at least demonstrated its good faith and "provided some documents" before litigating the disputed material, something TDOC has failed to do. *See, e.g.*, *Jordan*, 921 F.3d 184.

Because TDOC's no-discovery-at-all orientation is so divorced from the caselaw, the only way it could possibly make sense would be if there were somehow stronger confidentiality interests at stake in Tennessee than there were anywhere else. There aren't. TDOC's factual predicate for its confidentiality concerns is a single declaration that merely restates the same dynamics that are present everywhere: the Department has promised secrecy and the supplier would back out if revealed. *See* Dkt. 1-12. So, too, in Ohio, Georgia, Florida, Idaho, and Indiana. Yet in all of those states discovery has not been short-circuited in its entirety, which is what TDOC lobbies for here.

To the limited extent that TDOC's declaration does address the real issue here, it is unpersuasive. As an initial matter, the evidentiary value of the declaration is undermined substantially—if not eliminated altogether—by the anonymity of its source. "Without any record

whatsoever of a witness's identity or their signature, a declarant cannot be held to their statements under penalty of perjury." *KeyView Labs, Inc. v. Barger*, No. 8:20-cv-2131, 2020 WL 8224618, at *6 (M.D. Fla. Dec. 22, 2020), *adopted by* 2021 WL 510295 (M.D. Fla. Feb. 11, 2021). While Mr. Pizzuto appreciates the fact that an execution-drug *supplier* would only be able to provide a declaration under a pseudonym, that is not the case with respect to correctional employees who are simply interacting with the suppliers. To the contrary, such employees routinely provide evidence under their real names. *See In re Mo. Dep't of Corrs.*, 839 F.3d at 734 (discussing an affidavit along those lines by a correctional director); Ex. 4. There is no rationale for the TDOC declaration's anonymity in any of the Department's filings, and it should be disregarded by the Court. Without the support of the declaration, the motion to quash fails by definition. *See Scricca v. Boppy Co.*, No. 3:22-cv-1497, 2024 WL 1211061, at *4 (D. Conn. Mar. 21, 2024) ("Whether asserted as a stand-alone objection under Rule 26(c)(1) or as part of a lack-of-proportionality objection under Rule 26(b)(1), a claim of undue burden or expense typically must be supported by an affidavit or other evidence.").

Even if the declaration is considered, though, its statements on the key issues are "inherently speculative," *In re Mo. Dep't of Corrs.*, 839 F.3d at 735, and insufficient to satisfy TDOC's burden of proof. The declarant opines that "other suppliers have been identified through litigation despite the use of redactions or protective orders." Dkt. 1-12 at 2. No examples are offered. This statement is essentially a legal argument, especially as it is phrased as an assertion about what has happened "through litigation." *Id.* As such, TDOC's attorneys should have made the assertion themselves and provided support, if they wished the Court to rely upon it. Mr. Pizzuto disputes this anonymous individual's characterization. Execution suppliers have been outed in a number of different ways. But, so far as undersigned counsel knows, it has never

happened in the way TDOC fears it would here—"through litigation" in a case where appropriate measures like redactions and protective orders were adopted. Some disclosures have happened through public-records litigation involving requests that directly targeted suppliers' identities. *See, e.g.*, *McGehee v. Tex. Dep't of Criminal Justice*, No. H-18-1546, 2018 WL 3996956, at *7 (S.D. Tex. Aug. 21, 2018); *Cover v. Idaho Bd. of Corr.*, 167 Idaho 721, 725–26, 476 P.3d 388, 392–93 (2020). Other sources have been unmasked by the media. *See, e.g.*, Last Week Tonight with John Oliver, *Executions*, YouTube (Apr. 7, 2024), https://www.youtube.com/watch?v=SOn3wba8c-Y, at 11:24–16:15; Chiara Eisner, *NPR investigation reveals information about death row in Texas*, NPR, July 10, 2024, https://www.npr.org/2024/07/10/nx-s1-5028187/npr-investigation-reveals-information-about-death-row-in-texas. When that happens, the media uses its own methods. Last Week Tonight is a good example. As the link above shows, Mr. Oliver's researchers uncovered the company that made the federal government's raw execution chemicals by submitting public record requests to federal regulators, discussing the information with liaisons at those agencies, speaking to confidential sources, reviewing correspondence sent by congresspeople, and reading news articles produced by other outlets. None of that took place "through litigation."

When TDOC's declaration ventures into specific types of documents, its unnamed witness becomes even less credible. Again without citations, the witness voices anxiety about "[s]eemingly benign information—like the manner of production of a drug, identities of independent testing labs, and even the arrangement of information on a suppliers' documentation about drugs." Dkt. 1-12 at 2. Of course, the identity of a testing laboratory is something TDOC could easily redact. Furthermore, even the declaration does not make the implausible case that *every* document responsive to the subpoena risks piercing the veil, which is what TDOC would

have to prove to get the order it desires. Take "temperature logs," a type of document singled out by the subpoena. *See* Dkt. 1-1 at 7. Those would presumably be compiled solely by TDOC and have no connection to the supplier. There is no imaginable secrecy danger posed by them.

As for the kinds of information emphasized by TDOC, they are not "seemingly benign." They are actually benign. As it happens, such documents have been getting turned over in discovery for years without incident. *See, e.g.*, Ex. 14 (Arizona purchase order); Ex. 6 (Idaho purchase orders); Ex. 15 (federal certificate of analysis); Ex. 16 (Idaho certificate of analysis). None of those documents have led to sources being outed. All of them would be responsive to Mr. Pizzuto's subpoena. The unsubstantiated conspiracy theory in TDOC's anonymous declaration does not put it in its own unique category.

It is worth returning to the point about redactions. "Redaction" is a word that is conspicuous by its absence from TDOC's motion to quash. *See generally* Dkt. 2. Nonetheless, redactions are the time-tested mechanism for federal courts to ensure that genuinely confidential information be insulated from another party or the public. The tool has been successfully used in execution litigation as well. *See, e.g.*, *Brant*, 2024 WL 21970, at *5 ("But, as Plaintiffs propose, documents and information related to how the drugs are manufactured or created can be redacted to provide relevant information about purity and efficacy without disclosing identifying information of the source."); *Martin*, 2021 WL 1186749, at *9 ("With the redaction of any information that could possibly identify any entity or person involved in" executions, "the Court concludes Defendants have not met their burden of showing good cause for the complete withholding of documents sought in" the discovery requests."); Ex. 9 at 16 ("INDOC can redact information that would identify the supplier of its pentobarbital.").

It is TDOC's burden to prove that it is entitled to quashing under Rule 45(d)(3)(A). *See, e.g.*, *Hodgdon v. Northwestern Univ.*, 245 F.R.D. 337, 341 (N.D. Ill. 2007). As part of that burden, TDOC must demonstrate that redactions would not suffice to ease the burden it is describing. *See Cody v. City of St. Louis*, No. 4:17-cv-2707, 2018 WL 5634010, at *4 (E.D. Mo. Oct. 31, 2018) (denying a motion to quash in part under Rule 45(d)(3)(A)(iii) because the records could be redacted to reduce the burden on the recipient of the subpoena). TDOC has not even attempted to make that showing, even though the subpoena itself contemplated the possibility of redactions. *See* Dkt. 1-1 at 7.

Although the burden is on TDOC, Mr. Pizzuto submits that all of the documents sought by the subpoena can be safely redacted to protect the identity of TDOC's drug supplier. Something like a "purchase order," Dkt. 1-1 at 7, likely contains only one piece of information that puts the identity of the supplier at risk—its name. In an email with a supplier, there is nothing difficult about finding names or locations and blacking them out. *Cf. Blau v. Ga. Dept. of Corrs.*, 364 Ga. App. 1, 8, 873 S.E.2d 464, 470 (Ct. App. 2022) (interpreting Georgia's execution-secrecy act as allowing the state to redact only text that "*reveals* a name, residential or business address" or other unique identifying information while requiring the disclosure of records otherwise responsive to open record requests (emphasis in original)).

On one final note, it is important for the Court to understand the full context of TDOC's history with respect to executions, rather than the Department's highly selective one. *See* Dkt. 2 at 5. While TDOC focuses on its difficulties in finding drug suppliers, *see id.* at 2–5, it has had another set of entirely different difficulties. Those difficulties began surfacing in 2022, when Governor Lee imposed a moratorium on executions as a result of serious questions about TDOC's approach to its lethal chemicals. *See* Ex. 17 at 4. Governor Lee appointed former U.S.

Attorney Edward L. Stanton III to lead an investigation into the matter. *See id.* at ii. After a lengthy inquiry, Mr. Stanton produced a report detailing many problems with TDOC's handling of execution drugs. Most notably, Mr. Stanton found that TDOC had repeatedly failed to test its execution drugs for endotoxins despite a clear provision in its protocol requiring it to do so. *See id.* at 39–40. Although TDOC's interest in supplier secrecy is valid (and not endangered by the present subpoena), there is another countervailing reality in play, which is that it has an incentive to take the kind of expansively obstructionist posture it has adopted here because its own mistakes are thereby hidden from view. *See* Josh Marcus, *Top Tennessee prison officials fired after report finds 'shocking' issues with death penalty drugs,* The Independent, Jan. 23, 2023, https://www.the-independent.com/news/world/americas/crime/tennessee-death-penalty-report-firing-b2267705.html.

Consider some of the documents relied upon by Mr. Stanton's report. In surveying drug issues from recent executions, Mr. Stanton relied extensively on written communications between those involved in the acquisition and testing of the chemicals. *See id.* at 23–33. He quoted from many of those communications while using nondescript titles to refer to the individuals. *See id.* In one excerpted text message, Mr. Stanton described how "the Pharmacy Owner informed the Drug Procurer via text message that the Pharmacy was 'having issues with the potassium chloride and that they 'can't use it' because it was 'falling out of the solution.'" *Id.* at 29. Elsewhere, the report notes that "the Pharmacy Owner texted the Drug Procurer to inform him that they had 'missed the mark by 2% points'" on a particular drug test. *Id.* at 32. If these sorts of messages have been sent about Tennessee's new pentobarbital, they would be undeniably responsive to the subpoena and probative of Mr. Pizzuto's Eighth Amendment claim, as they would speak to concerns about the reliability of drugs. And Governor Lee himself

decided that such messages could be viewed by the entire world online. *See Gov. Lee Announces Decisive Action to Ensure Proper Protocol at TDOC*, Dec. 28, 2022,

https://www.tn.gov/governor/news/2022/12/28/gov--lee-announces-decisive-action-to-ensure-proper-protocol-at-tdoc.html. The idea that TDOC cannot now reveal a single word about its current drugs, even with redactions, is irreconcilable with the commonsense approach taken by Tennessee's own Governor only two years ago.

At a bare minimum, TDOC has made no meaningful effort to show that the contrary proposition is true—that redactions are infeasible. As a result, it has not discharged its obligation of pointing to an undue burden.[8]

## V.    At a minimum, TDOC must provide a privilege log.

Regardless of what else the Court orders, it should direct TDOC to produce a privilege log, which is required by the rules, and which is necessary in this case to fully and fairly evaluate the Department's appeal to secrecy protections.

Mr. Pizzuto's subpoena specifically requested a privilege log. *See* Dkt. 1-1 at 7. TDOC has not provided one. *See* Ex. 1. When a non-party objects to a federal subpoena, Rule 45 requires it to "describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Fed. R. Civ. P. 45(e)(2)(A)(ii). The importance of privilege logs is reflected by the fact that the failure to provide one constitutes a waiver of the privilege, *see Johnson v. Gross*, 611 F. App'x 544, 547–48 (11th Cir. 2015) (per curiam), and by the fact that

---

[8] On the other side of the scales from the burden on TDOC is the benefit to Mr. Pizzuto of the requested information. *See, e.g., Yates v. NewRez, LLC*, No. 8:21-cv-3044, 2022 WL 2105933, at *3 (D. Md. June 10, 2022). For that factor, Mr. Pizzuto relies on his discussion of relevance above. *See supra* at Part III.

"[a] claim of privilege may be defeated by an inadequate log," *United States v. Davita, Inc.*, 301 F.R.D. 676, 684 (N.D. Ga. 2014). A proper privilege log includes 1) the name and title of the author; 2) the recipients of the document; 3) the type of document; 4) its date; and 5) "a general description of the subject matter of the document." *Executive Mgmt. Servs. v. Fifth Third Bank*, 309 F.R.D. 455, 464 (S.D. Ind. 2015). TDOC's refusal to provide any of that information has resulted in a waiver of the protections that it is invoking under Rule 45. Furthermore, the absence of a privilege log is especially problematic in the present case. As detailed above, TDOC has refused to produce a single scrap of paper in response to the subpoena and it is entirely unknown what materials might be in its possession. Although the motion to quash can be properly denied without requiring a privilege log, based on TDOC's other failures, it certainly cannot be granted in the absence of one. *See id.* at 465 (compelling a delinquent party to provide a proper privilege log within seven days).

**VI.    If necessary, a protective order may be entered.**

If the Court does not deny the motion to quash outright, as Mr. Pizzuto urges, it should also consider the utility of a protective order. "[M]odification of a subpoena is preferable to quashing it outright." *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004). In keeping with that tenet, "[w]hen a court is confronted with a motion to quash . . . a subpoena, its duty is not to deny any discovery, but to reduce the demand to what is reasonable, considering the discoverer's needs and the discoveree's problems." *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 560 (7th Cir. 1984). The main mechanism for achieving that balance is a protective order designed "to protect" the recipient from the "loss of confidential information . . . while still giving" the requesting party "discoverable information." *Id.* at 564. When a district court quashes a subpoena and refuses to issue a protective order under circumstances where it

would accommodate the recipient's secrecy concerns, it is an abuse of discretion. *See id.* ("To give [the inquiring party] virtually no information we reluctantly call an abuse of discretion.").

By not seeking such a protective order, which it has the burden of doing, *see id.* at 559, TDOC is leading the Court down the primrose path to reversal. Assuming arguendo without conceding that TDOC has information that cannot simply be disclosed in the ordinary manner, the way to accommodate its concerns would be through a protective order. Such an order could ensure that only Mr. Pizzuto's attorneys and their agents have access to the documents, and that they are guided by judicial restrictions on the use of the information.

### VII.    The conditions in the subpoena are not a basis to quash it.

Finally, TDOC objects to the definitions and instructions in the subpoena. *See* Dkt. 2 at 16. Mr. Pizzuto believes the terms are reasonable, but at any rate modification of the subpoena would be the suitable remedy for TDOC's complaint—not quashing.

TDOC's first criticism is that the subpoena "appears to target information that falls squarely within the attorney-client privilege and the work-product doctrine." Dkt. 2 at 16. It is true that the subpoena calls for documents that are potentially protected under these privileges. Privileged information is commonly responsive to subpoenas. That is why the responding party is "obliged by federal law to establish the privileged nature of the communications and, if necessary, to segregate the privileged information from the non-privileged information." *United States v. Ruehle*, 583 F.3d 600, 609 (9th Cir. 2009). A privilege log from TDOC would do so.

Next, TDOC opines that "the terms of the request itself make it impossible for the Department to determine [its] full reach" because the subpoena includes the phrase "and so forth." Dkt. 2 at 16. In using that phrase, Mr. Pizzuto was merely clarifying that the examples of documents that he cited in the subpoena were non-exhaustive. That is a different scenario than

the one in the case cited by TDOC, where the plaintiff sought sanctions on the basis that the defendants failed to provide "contractual information with outside providers" based on a discovery request that asked only for "policies regarding inmates' access to health care." *Vontz v. Malone*, No. 2:19-cv-12735, 2022 WL 1037100, at *2 (E.D. Mich. Apr. 6, 2022). Unlike in *Vontz*, Mr. Pizzuto is not attempting to use "and so forth" to describe materials *outside* of his core request, which is for pentobarbital-related information. He is using the phrase only to confirm that his request is not limited to the specific examples he listed. If TDOC is unsure of the full scope of the request, it can at least provide Mr. Pizzuto with the highly particularized documents that he asked for while engaging in a good-faith discussion over how to accommodate the remainder.

Relatedly, TDOC is distressed by how time-consuming and expensive a search would be given the number of potential custodians referenced in the subpoena. *See* Dkt. 2 at 17. Again, Mr. Pizzuto would be open to a negotiation over the contours of the search. However, the starting place should be the production of the specific documents he has mentioned.

TDOC protests boilerplate language in the subpoena about metadata. *See id.* Initially, the reference to Mountain Standard Time in the subpoena is a typo. Mr. Pizzuto does not expect TDOC to adjust its documents to a different time zone than the one it operates in. As for the request for metadata more generally, that is a debate that can only begin—as it did in the case TDOC cites—after the Department produces documents in some other form that it prefers. *See Williams v. Sprint/United Mgmt. Co.*, 230 F.R.D. 640, 643 (D. Kan. 2005).

Lastly, TDOC quarrels with the instructions in the subpoena regarding the provision of a log describing responsive documents that have been lost or destroyed. *See* Dkt. 2 at 17–18. There is nothing improper about a subpoena calling for an account that addresses what happened to

responsive material that is no longer available. *See, e.g., Acosta v. JY Harvesting, Inc.*, No. 17-cv-1225, 2017 WL 3437654, at *5 (S.D. Cal. Aug. 10, 2017) (ordering a responding party to provide a declaration attesting, if true, "that no documents were destroyed in anticipation of the present investigation"). Contrary to TDOC's unelaborated suggestion, the request for such information is no more of an interrogatory than is a request for a privilege log, which—as described above—is routinely part of the subpoena process.

## VIII.  Conclusion

TDOC's filing is reverse-engineered to justify its decision—made in advance—that it would refuse to honor any aspect of a valid subpoena regarding anything related to its execution drugs. Because that approach is incompatible with fundamental precepts of federal discovery law, Mr. Pizzuto respectfully asks the Court to deny TDOC's motion to quash, Dkt. 1, or in the alternative order the Department to provide a privilege log.

DATED this 30th day of March 2025.


*/s/ Jonah J. Horwitz*            _____
Jonah J. Horwitz (pro hac vice pending)
Federal Defender Services of Idaho

Nicole Owens
Executive Director
Jonah J. Horwitz, Idaho Bar No. 10494 (pro hac vice application pending)
Assistant CHU Chief
Federal Defender Services of Idaho
702 W. Idaho Street, Suite 900
Boise, ID 83702
Telephone: (208) 331-5530
Facsimile: (208) 331-5559
Jonah_Horwitz@fd.org

*/s/ Kimberly S. Hodde*
Kimberly S. Hodde
Hodde & Associates

Kimberly S. Hodde
Tennessee Bar No. 20128
Hodde & Associates
40 Music Square East
Nashville, TN 37203
Telephone: (615) 242-4200
Kim.Hodde@hoddelaw.com

*Attorneys for Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of March 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

Jonah Horwitz
Jonah_Horwitz@fd.org

Cody Brandon
Cody.Brandon@ag.tn.gov

David Wickenheiser
David.Wickenheiser@ag.tn.gov

Mary McCullohs
Mary.McCullohs@ag.tn.gov

Matthew Kubicek
Matthew.Kubicek@ag.tn.gov

*/s/ Kimberly S. Hodde*
Kimberly S. Hodde